Good morning. First case today is number 20-1276, Terrence Thompson v. Administrator of NJ State Prison. Mr. Rowe? May it please the court, I'm pleased to be here on behalf of the Duquesne University School of Law Federal Litigation Clinic. And I'm working in this case with Sam Simon, who's also supervising attorney in the clinic. I'm pleased to introduce Peyton Myers, who will present argument on behalf of appellant Terrence Thomas. We are joined today by Ashley James and Jane Schleicher, who are two other students who worked on the briefs. Terrific. Thank you, Mr. Rowe. Ms. Myers, welcome. Good morning. May it please the court, I'd like to request three minutes for rebuttal. Granted. This is a case about a man who has spent over a decade in prison beyond where he would have been eligible for parole after having been left completely in the dark as to his true sentencing exposure by his attorney. Because neither the presiding judge, the state's attorney, or Mr. Thompson's counsel undertook to explain what Mr. Thompson's true sentencing exposure was, there is an inescapable and fundamental misrepresentation contained in the colloquy that resulted in Mr. Thompson's decision to proceed to trial. But what is the prejudice here? What prejudice did he suffer? Isn't it pretty clear from his plea colloquy that he thought, you know, 30 years was pretty much a life sentence anyway, and he wanted to roll the dice? Well, that is true, Your Honor. I would point your attention to Mr. Thompson's testimony at the PCR hearing, where when asked whether or not he understood the sentence and was asked what the sentence meant to him, he explained to the judge that his understanding was that he would serve 30 years and then go in front of the parole board. And when further pride responded again, saying that he was he understood his sentence to mean that he would serve 30 years. But he said he also thought he wouldn't get parole. Right. I mean, that was a real possibility that he'd stay in jail for the rest of his life. That is correct, Your Honor. However, I believe that his understanding of what was going on was impacted by his attorney's ineffectiveness and failing to interject or ensure that he understood that the plea that the state was offering was the best that it was ever going to get. What do we do with the fact that he never raised this on direct appeal? He never raised it. He raised four issues in his original PCRA. If he was so shocked that, oh, my goodness, it was really a life sentence, not just 30 years, wouldn't you think he would have said something earlier on? Wait a minute. This is wrong. This is an injustice. It sounds to me like he almost equated 30 years for the life sentence anyway. Well, that is true, Your Honor. I believe that the prejudice that resulted from this surmounts this sentence. The nature of Mr. Thompson's counsel and effectiveness in failing to ensure that he understood the ramifications of denying this plea and opting to proceed to trial. And not explaining to him his true sentencing exposure is inherently prejudicial. He went forward under the false impression that trial, a conviction at trial may cost him life in prison. When you say it's inherently prejudicial, that sounds like you're claiming this is some sort of structural error that will always require relief to be awarded. Is that your argument? I would turn your attention to Lafler v. Cooper, where the Supreme Court addressed an issue very similar to this and reasoned that a defendant who goes to trial, instead of taking a more favorable plea, may be prejudiced from either a conviction on more serious counts or the imposition of a more serious sentence. That's the word may. It could be. There's the possibility. That is correct, Your Honor. I mean, Lafler v. Cooper is an important case because Lafler v. Cooper stands for the proposition that you're entitled to effective counsel at the plea bargaining stage. And that's an important case here. And that's essentially what you're arguing, correct? That is correct, Your Honor. I would also turn your attention to a case from the Court of Appeals for the Second Circuit, the case of United States versus Gordon, where the Second Circuit addressed an issue analogous to the one that is presented here today. There, the court found that the fact that there is a great disparity between the sentencing exposure represented by a defendant's attorney and the actual sentencing exposure under the sentencing guidelines doubled with the defendant's testimony that, had he been afforded the effective assistance of counsel, he would have accepted the plea, provides sufficient evidence under Strickland for a finding of prejudice. It can, but must it? I think that this is a case where the prejudice rises to the level where relief is warranted. What was unreasonable about the determination? Because that's really, you've got a real burden here to say it was unreasonable. You have a double burden. That was my question, too. You have a double burden to show here. You've got to show prejudice, but you also have to show that the last decision of the state courts in the PCRA applied federal law unreasonably. Your Honor, while it is true that a claim that has been adjudicated on the merits should be assessed under the deferential standards set forth in the AEDPA, deference only goes so far. This standard was never intended to bar ineffective assistance claims altogether, nor was this standard intended to protect against the combined errors of Mr. Thompson's inefficient counsel and the state. This case. Focus on what the ruling was that we're looking at and see what was unreasonable about that determination. So if you could address that. Yes, Your Honor. The PCR judge's conclusion that the district court ended up affirming was based on an unreasonable determination of facts in light of the evidence presented, consistent with Miller versus Cockrell and Section 2254 D2 under the AEDPA. The PCR judge reasoned only after Mr. Thompson's testimony had completed that he was incredulous and that his statements were self-serving as a result of an alleged pause and a dropping of the head when responding to her questions. When asked, however, three separate times what Mr. Thompson would have done or if he would have accepted the plea, he responded affirmatively three times. The PCR judge didn't include this pause or this dropping of the head, which led her to find Mr. Thompson incredulous in the record. It wasn't until her requirement that a trial judge do that. I don't know the answer to that, Your Honor. I would have to get back to you on that one. I think, however, though. The basis of her conclusion is unreasonable in light of the facts that were presented to her. Mr. Thompson responded. That sounds like you're you're saying that she had to believe him when he said I would have taken the plea. I mean, excuse me, that when. Yeah. In other words, he did. He testified. He testified, as you said, that's in the record. But she didn't believe him. So what can an appellate court do with that? We don't. We defer to that. I would again turn your attention to Lafleur v. Cooper, where the Supreme Court articulated that this court has a choice whether or not to apply deference in Lafleur. The Supreme Court opted against applying deference to the claim as they found that Lafleur and Edpa case. I believe so, Your Honor. Yes, I have to get back to you on that one as well. But they opted against applying the deference because. They found that the lower courts analysis of the respondents ineffective assistance claim was contrary to clearly established federal law. And while I'm not here today arguing that I believe the opinion was based on an unreasonable application of clearly applied federal law. I do believe that the PCR judge's ultimate conclusion was based on an unreasonable determination of facts in light of the evidence presented. But this is a credibility finding, and I don't think Lafleur was a credibility situation. It's almost like you want us to find a PCR judge incredible. That she didn't really think that that demeanor made him lacking in credibility. But it's very tough to say that an adverse credibility determination is an improper determination on the facts. When that judge is right there observing, and that's what judges do all the time. We judge credit and that's what juries do. You judge credibility and to overturn that and say it was unreasonable. I'm just not sure that this record supports that. I would also like to note that the PCR judge very well neglected the fact that Mr. Thompson has been serving time in prison since his conviction and was potentially overcome with emotion in responding to her questions. And maybe it was coming to terms with the fact that he was getting a second chance and maybe that is why he paused. If the PCR judge wanted to base, as she did base her conclusion on the fact that Mr. Thompson was incredulous because of a dropping of the head in an alleged pause, one would think she would have made a record correspondingly indicating so. In addition to the pause, isn't it true that Thompson himself said, I got pretty much been dealt a life sentence already, so it doesn't really matter. I'd rather just go to trial. That is true. Mr. Thompson made that statement at the pretrial conference and there his main focus was on this medical issue, which isn't an issue in front of this court today. He believed that by proceeding to trial, his medical issues would be tended to sooner. But he did understand what was being offered to him. I mean, the prosecutor said we're offering him 20 with a 10-year, you know, parole eligibility. He said, no, it was 22 and 11. So he knew what was being offered and the judge consistently said, listen, I've not seen a police offer like this. This is pretty good. I want to know that you really mean this because this is a really good offer. And he said, what Judge Hardiman already said, you know, well, I pretty much got a life sentence. He basically seemed to want to roll the dice and say I want to try to, you know, be found not guilty. And the court reminded him that he was facing a potential life sentence. Yes. A question I have for you. If we agreed with you, okay, if we concluded that the state court's action or determination of the facts were unreasonable here, what remedy are you asking us for? What should we direct the state courts to do here? The proper remedy for this constitutional violation would be reinstatement of the plea that was offered to Mr. Thompson. In Lafleur, the Supreme Court indicated. We would order that the plea be, that the sentence offered at the plea be imposed? Yes, Your Honor. Even though it was never accepted in the first place, would we have the authority to do that? I would turn your attention to Lafleur where the Supreme Court indicated that Sixth Amendment remedies must be tailored to the injury suffered and should not unnecessarily infringe upon competing interests. The reoffering of the. If we follow Lafleur, that just means he gets effective counsel at the plea stage, right? Everyone agrees he didn't get effective counsel at the plea stage here. That's why we're just talking about prejudice, right? Correct. But to Judge Fisher's question, it would seem then that they would have to go back for effective negotiations. And who knows what effective negotiations would lead to? It wouldn't necessarily lead to a 30-year sentence, would it? Effective negotiations might break down and result in a trial, right? The reinstatement of the plea, however, would place Mr. Thompson in the same place, same position, no better, no worse, that he would have been in had he received the effective assistance of counsel. That's what you're asking us to do. Correct, Your Honor. All right. You've reserved time for rebuttal. Thank you, Miss. Thank you. Mr. Magid, did I pronounce that correctly? You did, Your Honor. Thank you. Thank you, Your Honors. May it please the Court, I would initially like to address the disparity aspect in this case with respect to what the defendant was told his exposure was and what the actual exposure was in this case. So the defendant was clearly told his minimum maximum exposure was the life due 30 at the time that he decided to reject it and go to trial. The defendant then subsequently, as the Court is aware, was sentenced to a life due life. Now, it has been argued. Mr. Magid, let me ask, could you just speak a little more slowly because the quality of the audio is good but not great? Certainly. I apologize. He was told 30 to life, correct? Correct. So he was told that the mandatory minimum would be the 30 years and then the upper number would be the life number. Now, with respect to the life due life, it has been argued or viewed that this means the defendant will never see the light of day. And that is actually incorrect. Pursuant to subsection E of the statute that he was sentenced under, he is eligible for parole once he turns age 70 and has served 35 years of his sentence. So that in relation to a life due 30 sentence, the actual difference between the two is seven years, four months, and approximately 15 days. So that is the true disparity that we are talking about in this case in relation to a life due 30 versus a life due life. So it is not that the defendant will never see the light of day. It's that when he meets that criteria, he shall be eligible for parole. So, again, it's a difference of seven years and four months. That is the disparity in this case. But that it's his understanding of what's at stake that matters here, isn't it? Not the actual disparity. I mean, that extra part about age 70, 35 years, it was nowhere in the record or in his understanding. Correct. We do look to the defendant's understanding, but also we have to actually look to the actual disparity when we are trying to determine what the prejudice is here. If we weren't to look to the actual disparity, then how can we determine what the prejudice is? In any case that's viewed, I'm sorry, when we view the prejudice, we view the actual exposure versus what was told. So in that sense, the life due life versus the life due 30. But even if we were to just simply view it on those terms, the life due 30 versus the life due life, as found by the lower courts, which is afforded that the deference and which defendant has to rebut by clear and convincing evidence. The factual determinations were that the defendant would not have accepted the 2210 when he was told life due 30 and that if he had been told life due life, that would not have changed the outcome in this case. That is a factual determination that must be rebutted by clear and convincing evidence, which the appellant has failed to do in this instance. And the lower courts as well as the district court relied upon not only the pretrial conference where defendants said that he adamantly wanted to go to trial. He was fully informed of his exposure and he said, I want to go to trial. Now, there's actual additional information that was part of the record that, and I apologize, this is not part of my brief, it was submitted in the appendix, I believe it's JA 416. And it's an actual reference to the January 20, 2000 transcript, which was actually jury selection. They were actually before the court for jury selection, and they went on the record because there was an issue with a potential prospective juror appearing because of a snowstorm. There was no substantive issue. Yet while on the record, the defendant felt compelled to address the court. And when he addressed the court he was addressing the court with respect to what he felt defense counsel had not done with respect to an investigation of the case. And if I could just quote from that transcript the defendant said, I talked to my lawyer, I gave him some leads to follow up on months back, and I guess he was under the impression I was going to take the plea bargain. He then says, I told him three years ago, I'm not copying out, not telling the judge something I did not do, nor have any memory of. He then later stated, but I have stuff to prove my innocence. And then he concluded by telling the judge that he was being threatened by Latin gang members related to the two co defendants who are going to testify against him at trial, threatening him to take the plea deal in this case because they did not want to have to come to trial to testify. Under all of that pressure, and by specifically telling the court that he had no intention of plea bargaining. It is clear that the defendant had no interest in taking a plea in this instance. So regardless of the life to 30 versus the life to life. This defendant was not going to take a plea in this case. How about his medical situation the fact that he thought he perhaps thought he was going to get more medical attention if he went to trial. First and foremost, the medical issues in this case has been fully litigated. They were rejected by the district court, and a certificate of appeal ability was not provided to address the medical aspects aspects of the case, he raised below before the lower state court. The issue of his competency due to his medical condition to actually decide to go to trial, and to stand trial to be able to participate in this trial, and the lower courts rejected that. So, even if we were to determine or view or question, whether his medical position or belief influenced his decision to plea. That would not help or support his case in this instance because he's not alleging that due to his medical condition. He did not that that's why he didn't take the plea bargain the issue is the life to life. And at the PCR hearing the defendant was specifically questioned. Did your attorney give you any misadvice with respect to if you don't take the plea bargain or if you do take the plea bargain that will affect the medical treatment you will receive, and the defendant rejected that and said no he did not misadvise me as to taking a plea or not taking a plea in relation to my medical treatment. So again, under the guise of ineffective the council counselor, if we overturned the PCR courts credibility determination. Would that cause you to lose. I don't believe so Your Honor, because again, the cold record from the pre trial conference, and now from that January 20 2000 transcript, the defendant made it patently clear that he did not want a plea bargain in this case that he wanted to go to trial. So even if this court were to reject, which the appellees submit there is no basis to do so in this instance, that would not that would not alter the outcome in this case. What about the remedy. This Myers said that if we find for Mr. Thompson, that we should impose the plea deal. What's your response to that. The appellee's position is that should not be the case. And that goes to, in a case of this situation, you look at where the ineffectiveness came into play, or where the deficiency and as to what he was told his exposure was to what the actual exposure was. He readily rejected a life due 30. When he was told he faced a 20 to 10. So, if this case were to be were to be remanded back for a remedy, the defense should not be afforded the 20 to 10 that would be what constitutes a windfall, which laughs were squarely rejected. It would be the state's position that the defense should be entitled to a life to 30, because to even put this case back to a position of plea negotiations. If the defendant were to reject any plea negotiations and decide to go to trial. Now the state would be would be placed in an absolute detrimental position to try to retry this case. Almost 30 years later at this point and that's also what laughter discusses that it cannot be a windfall for the defendant but you also can't put one of the parties in a position that is of the utmost impossibility and that was what it would be for the state in this case. So when the defendant rejected that life to 30. That's what he should be afforded if there is a remedy in this case. Well, how can that be he if we were to find that the PCR court was wrong and given all the facts, he would have accepted the plea deal had he known that it was life. Why would he not be entitled to the plea. Because again what we're looking at here is that he rejected the life to 30 when he was told the plea was 20 to 30 to life but if we find that that does not equate to him having rejected life to life. But and had he known life to life he would have accepted the plea. Then, why doesn't that ineffectiveness mean that that prejudice is he should be allowed to take the plea if he wants to. Because again under laughter that would constitute a windfall to the defendant because when offered a 20 to 10 and told he was facing a life to 30 he's he squarely rejected that. And again, the minimum disparity between the life to 30 and the life to life is also what comes into play with respect to that remedy. I read laughter differently but that's I'm sorry. Unless the court has any further questions for the state the state would rely on its brief. Okay, thank you Mr. Thank you. We'll hear rebuttal of Ms Myers. Just a few things your honors. Mr. Thompson has a history of accepting please, when he has been afforded the effective assistance of counsel into prior convictions, Mr Thompson accepted please and never went to trial. Everyone agrees here that Mr Thompson sixth amendment rights have been violated. Mr Thompson was told the wrong sentence. The wrong exposure was given to him before rejecting the lower sentence, the plea. He needed to understand the nature of his upper exposure or what his maximum exposure was going to be. And here, he did not understand that. The disparity in the sentence received as compared to the sentence he would have received under the plea doubled with his own statements that had he been afforded the effective assistance of counsel, he would have pled guilty rather than proceeding to trial. Provide sufficient evidence for a finding of prejudice. The proper remedy for this constitutional violation is reinstatement of the plea offer of 20 years with a 10 year period of parole and eligibility. Thank you, your honors. Thank you, Ms. Myers. I want to thank the clinic at Duquesne University Law School for the pro bono representation of Mr. Thompson. We thank you as well. Mr. Magid, the court will take the matter under your honor. Well argued.